**Martin MOSS, Plaintiff,**

v.

**Margaret M. HECKLER, Secretary of Health and Human Services, Defendant.**

**No. 78 CV 1051 (ERN).**

United States District Court, E.D. New York.

May 4, 1983.

Harold Solomon, Lawrence, N.Y., for plaintiff.

Raymond J. Dearie, U.S. Atty., E.D.N.Y. by Jo Davis, Asst. U.S. Atty., Brooklyn, N.Y., for defendant.

## MEMORANDUM OF DECISION AND ORDER

NEAHER, District Judge.

This action is again before the Court following judicial remand to the Secretary on September 26, 1980, and subsequent proceedings before an administrative law judge and the Secretary's Appeals Council. Plaintiff originally filed an application on March 29, 1974 for a period of disability and disability insurance benefits by reason of "nervous condition and stomach trouble" as of February 15, 1973.[1] That application was initially denied on June 22, 1974 and not further pursued by plaintiff. Tr. II, 245.[2] On April 20, 1976 he filed a second application claiming disability as of November 18, 1975 by reason of "Hypoglycemia & Dumping Syndrome," which resulted from a hemigastrectomy and vagotomy performed on him at the Brooklyn Veterans Administration (VA) Hospital in 1969 to relieve his bleeding ulcers. Tr. I, 109–10. There is no question that plaintiff met the insured status requirement through December 31, 1979. Tr. II, 246.

After initial denials of his 1976 application, plaintiff had a *de novo* hearing before an ALJ on July 12, 1977, at which he was represented by his present attorney. Tr. I, 23. Plaintiff was then 54 years old, 6 feet 2 inches tall and weighed about 210 pounds. *Id.*, 28. He is a high school graduate, is married and has two grown daughters. He received a medical discharge from the Army in 1944 because of ulcers, and since 1976 or 1977 has been receiving 100% disability benefits of $1,078 per month from the VA. Tr. II, 438, 286, 320. Previously, he had been getting 30 to 40% VA benefits but could not state for how long. *Id.*

Following the 1977 *de novo* hearing, the ALJ found that plaintiff's post-gastrectomy and hypoglycemic conditions were not so severe as to prevent him from engaging in substantial gainful work activity and therefore he was not under a disability. The ALJ's decision was later adopted as the Secretary's final decision denying disability benefits. On review of that decision, this Court remanded the case to the Secretary for a hearing on the question of whether there were other occupations plaintiff could undertake in light of his condition.

Pursuant to the Court's remand, a second hearing before an ALJ was held on August 10, 1981. Plaintiff, represented by his attorney, testified that prior to becoming a cosmetics plant manager in 1966 or 1967 he had worked four or five years as a milkman, one year as route man for a bread company, and six or seven years driving a lunch wagon for a company servicing industrial plants. In performing those jobs he was required to keep records, make drops, order supplies, etc. Tr. II, 284, 287. After his gastrectomy in 1969 he continued working as a plant manager until late 1973. He quit that job because of diarrhea which kept him "running to the toilet" 10 to 12 times a day, "shakes and sweats," "near blackouts" and "dizzy spells," the last two usually occurring at home. Tr. II, 288, 290, 292. Although he took medication, it did not help. *Id.*, 291. In 1974, however, he drove a taxicab for about four months, and he has not looked for work since then. Tr. II, 287.

The record reveals differently. His earnings record reveals that in addition to earnings of $3,664 in 1974, he was credited with earnings of $5,502 in 1975. Tr. I, Exh. 12. And according to a report of Dr. Milford Blackwell, dated March 9, 1979, who examined him on December 19, 1978, plaintiff was driving his taxicab for his own pleasure on November 29, 1977, when he was involved in a motor vehicle accident. In addition to "blackouts for the past year," the report states that plaintiff complained of "headaches, blurred vision, spots before the eyes ..., episodic dizziness, impairment of balance, episodic nausea, weakness, easy fatigability ... nervousness, irritability, ... insomnia, fear of riding in cars, and neck pain and stiffness." Tr. II, 377.

---

1. Exh. 1, Transcript certified September 18, 1978, hereinafter "Tr. I."

2. Supplemental Transcript certified April 14, 1982, hereinafter "Tr. II."

The only treatment prescribed was Tylenol tablets for pain relief. *Id., 379.*

Many of the foregoing are the same complaints he attributed to his "dumping syndrome" problem. At the time of Dr. Blackwell's examination, however, plaintiff had increased his weight to 216 pounds, a condition incompatible with his claim of incessant diarrhea. As pointed out in *Lebron v. Secretary of Health, Education and Welfare,* 370 F.Supp. 403, 406 (D.P.R.1974), the effect of frequent diarrhea due to dumping syndrome is to substantially decrease weight, not increase it. See also *Williams v. Weinberger,* 373 F.Supp. 1110 (W.D.Mo. 1974), a case of post-gastrectomy syndrome with hypoglycemia, where evidence that the plaintiff had not only regained pre-operative weight but exceeded it indicated that there was no malabsorption of carbohydrates, fats or proteins. *Id.* at 1115.

Neither Dr. Leo I. Erdil, a surgeon and general practitioner who testified at plaintiff's 1977 hearing, nor Dr. Geoffrey M. Berlyne, a professor of medicine and chief of nephrology at the VA hospital and Downstate Medical Center who testified at the 1981 hearing, were treating doctors within the rule of *Eiden v. Secretary of Health, Education and Welfare,* 616 F.2d 63 (2d Cir.1980). Dr. Erdil's opinion that plaintiff is 100% disabled was based solely upon his examination of the VA hospital records and his concurrence with the VA evaluation. Tr. I, 42. Moreover, his response to a Bureau of Disability Determinations questionnaire that there was "no" fecal incontinence tends to contradict plaintiff's chief reason for being unable to work. Tr. I, 213. Dr. Berlyne, who examined plaintiff, did so on December 10, 1978, nearly three years prior to his testimony. Tr. II, 305. At that time he found plaintiff to be "a tall, well-nourished man" but, based on VA hospital notes, suffering from a severe dumping syndrome and hypoglycemia which has resulted in his total incapacitation. Tr. II, Exh. 29, at 396. Although this condition may now be surgically corrected, he did not recommend it because of plaintiff's age. *Id., 401.*

Also in the record is an affidavit of Dr. Alfred Snyder, an internist specializing in pulmonary disorders. Tr. II, 390. Dr. Snyder saw plaintiff only once, on June 6, 1979. He found plaintiff "well nourished" but appearing "extremely anxious and distressed." *Id.* He concluded that plaintiff's dumping syndrome, diarrhea, hypoglycemia "and a psychological disorder" prevents him from engaging in employment, and added that he is not taking medication "because it is not accepted medical practice for the combination of his disorders." *Id., 394.*

At Dr. Snyder's request, plaintiff was examined on June 17, 1981, by Dr. Irwin Hoffman, a member of a cardiovascular group, after reviewing VA records. Tr. II, Exh. 36, 552. According to Dr. Hoffman those records revealed "multiple coronary artery obstructions" and a stress test "grossly abnormal at Stage 3." Dr. Hoffman noted, however, that although plaintiff's hypoglycemic condition barred use of propanolol, another drug, Inderal, "would remove most of the symptoms of hypoglycemia, that is the sweating, palpitation and nervousness ...." *Id.* He nonetheless concluded that the combination of ailments with anginal syndrome totally disabled plaintiff "at this point." *Id., 553.*

As the Court's remand order noted, in this case "the treating physician was a succession of doctors" at the VA hospital where plaintiff was a frequent visitor as in-patient and out-patient. Their finding that plaintiff was 100% disabled for purposes of veterans' benefits, "while relevant, does not control the issue of eligibility for Social Security benefits." *Deyo v. Weinberger,* 406 F.Supp. 968, 969 n. 7 (S.D.N.Y. 1975), and cases cited. As pointed out in *Deyo,* the Social Security Act

"conditions its benefits not upon general ill health, but upon the existence of a 'physical or mental impairment' which must be 'of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national econo-

my, regardless of whether such work exists in the immediate area in which he lives, or whether a specific vacancy exists for him, or whether he would be hired if he applied for work.'" 42 U.S.C. § 423(d).

The VA hospital records pertaining to plaintiff cover periods of in-patient and out-patient treatment extending from February 1973 to and including April 1981. These reveal that his symptoms are controlled by diet when he chooses to follow that diet. As already indicated, he has suffered no loss of weight and has even increased it, which appears to contradict his testimony of constant daily evacuation. Tr. I, 33, 193; Tr. II, 288. His symptoms are aggravated by "anxiety" and his failure to take prescribed medication. Tr. I, 108; Tr. II, 289. Contrary to his hearing testimony, however, the records contain a statement that he left his job because of new management. Tr. I, 209. His earlier experience as a route driver undoubtedly explains his later employment as a taxicab operator; and the Secretary could well conclude that this, too, negated his claims of incessant diarrhea, especially in view of his earnings in that occupation as reflected in his earnings record. Tr. II, 428.

There are other statements attributed to plaintiff in the VA records which the Secretary could take into account in evaluating the credibility of his claims of "chronic life-long disability." Tr. II, 232. These indicate his ability to travel by automobile to Atlantic City, to go on vacations to Florida, to go to horse races and "play [the] ponies." Tr. I, 8. These activities occurred as late as 1981. Tr. II, 436, 450, 498. The Secretary is not obliged to accept without question the credibility of the plaintiff as to the extent of the discomfort caused by his dumping syndrome or hypoglycemia. He has the discretion, exercised through the ALJ who sees and hears the claimant, to arrive at an independent judgment in light of medical findings and other evidence. See *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir.1979).

■ Finally, plaintiff's later effort to gain disability benefits on the basis of coronary artery disease must fail. The burden of proof resting on a claimant includes the requirement that his disability have existed *prior* to the expiration of his insured status. *De Nafo v. Finch*, 436 F.2d 737 (3d Cir. 1971); *Henry v. Gardner*, 381 F.2d 191 (6th Cir.1967), *cert. denied*, 389 U.S. 993, 88 S.Ct. 492, 19 L.Ed.2d 487 (1967), *rehearing denied*, 389 U.S. 1060, 88 S.Ct. 797, 19 L.Ed.2d 864 (1968); *Toledo v. Secretary of Health, Education and Welfare*, 308 F.Supp. 192 (D.P.R.1970), *aff'd*, 435 F.2d 1297 (1st Cir. 1971). Here, there is no question that plaintiff's insured status expired on December 31, 1979, whereas the earliest manifestation of any cardiac problem was some five weeks prior to his first admission to the VA cardiac clinic on April 2, 1981. Tr. II, 430. The Secretary was not bound to accept the later opinion of another nontreating physician, Dr. Irwin Hoffman, who examined plaintiff on June 17, 1981, after his release from the VA hospital, and reported that the combination of his dumping syndrome and cardiac ailment rendered plaintiff "totally disabled at this point." Tr. II, 552–53. Dr. Berlyne, who testified on behalf of plaintiff, stated that plaintiff's 1981 cardiac problem was not attributable to any of his symptoms complained of prior to December 31, 1979. Tr. II, 310–11.

At the time of the 1981 rehearing, plaintiff was 58 years old and thus in the "advanced age" category under the Secretary's regulations in effect since February 1979. Regulations No. 4, 20 C.F.R. §§ 404.1502–1513, and Subpart P, App. 2. These regulations have been applied retroactively to cases pending at the time of promulgation. *Parker v. Harris*, 626 F.2d 225, 234 (2d Cir.1980). A claimant of advanced age, however, will not be considered disabled, if, as in the case of plaintiff, he possesses a high school education and has the residual functional capacity to perform sedentary work, even though his impairment is "severe." Subpart P, App. 2, *supra*, Table No. 1, Rule 201.05–08. Here, the Secretary found that plaintiff had work experience as a route man, plant manager and taxi driver,

and that his impairments did not prevent him from returning to his former occupation as a plant manager.

In addition, as directed by the Court's remand order, a vocational expert testified at the rehearing. He classified plaintiff's plant manager work as professional and involving supervisory skills. The other employments he viewed as primarily unskilled. Based on the assumptions that plaintiff's impairment did not restrict his capability for intellectual understanding and functioning, or his physical movements, the expert listed a number of jobs of a sedentary and entry level nature that plaintiff could perform without prior formal training. These were cashier, general office work, record keeping, etc., checker, examiner, packer-wrapper, assembler, filer, polisher, machine operator or automatic machine tender, the latter requiring only the pushing of buttons or pressing a lever. This list, the expert stated, was representative rather than exhaustive, and was based upon the wide availability of such jobs as described in the latest Census of Population. Tr. II, 330–33. Plaintiff acknowledged that there were "many, many machines" in the cosmetics plant he supervised for two or three or more years after he had his gastrectomy. Tr. II, 333; Tr. I, 110.

However much one may sympathize with plaintiff's distress, the evidence of record would not warrant reversal of the Secretary's reconsidered decision denying benefits. The record amply reveals that plaintiff's condition causes him no pain, does not interfere with his recreational activities or diminish his physique. The VA treating doctors have constantly reminded him that he can relieve his distress by strict adherence to a high protein, low carbohydrate diet and elimination of dairy products. The substantial evidence supports the Secretary's determination that plaintiff is not disabled from pursuing any gainful activity, and his decision is affirmed.

SO ORDERED.